UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>DAVID GALLAGHER,<br>Defendant. | C.A. No. 06-60 S |

**DECISION AND ORDER**

William E. Smith, United States District Judge.

Defendant and sometimes house-painter/drug-dealer David Gallagher moves to suppress oral and written statements he tendered to police during the course of his arrest and subsequent police-station debriefing. Based on the following findings of fact and conclusions of law, and pursuant to Rule 12(d) of the Federal Rules of Criminal Procedure, the Court denies the Motion to Suppress.

I. Findings of Facts

At all times relevant to this case, Gallagher lived at the Pineapple Inn in Newport, where he had been under surveillance by the Drug Enforcement Administration ("DEA") since at least early spring of 2006. As part of their investigation, agents of the DEA employed a confidential informant ("CI") to initiate a number of controlled purchases of crack cocaine from Gallagher. Voice transmitters outfitted on the CI's person and hidden cameras

planted in the CI's vehicle captured several-hundred-dollars worth of illegal-drug transactions throughout March and April 2006.

On May 10, 2006, a federal grand jury sitting in Providence indicted Gallagher for possessing with the intent to distribute 9.5 grams of crack cocaine in connection with a surveilled "buy" one month before. Agents obtained a federal arrest warrant, and, on May 16, 2006, executed it at the Pineapple Inn as part of a "drug sweep" that implicated other individuals not otherwise associated with this case. Preparing for the May 16 sweep, or "round up" as it was later described, Task Force Agent Michael Naylor informed other task-force agents of Gallagher's felonious past, including an assault on a correctional officer. Also, Agent Naylor relayed the following statement Gallagher made to the CI during an earlier buy: "I'd rather take the assault charge than get caught with drugs."[1] (Hr'g Tr. 8:1-3, Sept. 18, 2006.)

The "take down" commenced when, from his roving beige Buick, Special Agent and Group Supervisor Daniel MacIsaac spotted

---

[1] It is unclear whether this statement was recorded. The quoted language above is Agent Naylor's account of what Gallagher told the CI. Gallagher, who took the stand in his defense, confirmed the statement but challenged Agent Naylor's characterization of it. Gallagher explained that the statement was intended (albeit ineffectively) to prevent deceit, (Trial Tr. 38:16-17, 20, Sept. 21, 2006) ("I [Gallagher] said that as to the informant in case he tried to act funny . . . or do anything shady"), and was not directed at law enforcement. Whatever the purpose behind the statement, the words themselves were enough to put Agents on notice that Gallagher likely would not go gently into custody.

Gallagher traversing the parking lot of the Pineapple Inn. Strategically positioning his Buick in front of Gallagher, Agent MacIsaac and several other agents jumped out to effect the arrest. Of the agents that testified during the suppression hearing, Agent MacIsaac and Task Force Agent Joseph Colanduono testified that their weapons were drawn during the arrest; Special Agent Kathy Kelleher testified that her weapon was not. Agent Colanduono handcuffed Gallagher and conducted a pat-down in search of weapons. Agent Colanduono then placed Gallagher in the backseat of Agent MacIsaac's car.

Gallagher described a more graphic version of the arrest. Gallagher insists that, during the pat-down, Agent Colanduono inappropriately lowered Gallagher's pants in the presence of a small girl, presumably one of the motel manager's children who lived on site. Gallagher also testified that, when he complained about the predicament, he was told to "shut the fuck up" (Hr'g Tr. 23:3, Sept. 21, 2006), and that an agent threatened him with a taser gun. Agent Colanduono testified that he searched Gallagher's crotch area as part of the pat-down, but denied pulling down Gallagher's "low-rider type jam pants," (Hr'g Tr. 45:11, Sept. 19, 2006), as defense counsel colorfully described them. Agent Colanduono also denied the use of profanity, and explained that a Newport police officer accompanying the task force, Sergeant Stier, simply had his taser gun "at the ready position." (Hr'g Tr. 39:20-

21, Sept. 19, 2006.) No other agent recalled the status — or placement — of Gallagher's pants during the arrest, and Sergeant Stier was never called as a witness.[2] The Court finds Agent Colanduono to be a credible witness, and accepts his testimony on this issue over Gallagher's.

Agent Naylor, orchestrating five other arrests at the time, was notified the moment Agent MacIsaac spotted Gallagher, and arrived on the scene shortly after the arrest (one to three minutes later is the consensus).[3] Relieving Agent Colanduono, Agent Naylor escorted Gallagher to another vehicle, placed him in the backseat, and, according to Agent Naylor, read him his Miranda rights. Agent Naylor asked Gallagher whether there were drugs in his motel room. Gallagher said there were. Agent Naylor then asked for consent to search to search the room. Gallagher said yes. When asked for the key to the room, however, Gallagher responded that he did not know where the key was. Perhaps sensing hesitancy, Agent Naylor replied with something to the effect of "if you don't want to give consent, you don't have to give consent," (Hr'g Tr. 12:19-20, Sept. 18,

---

[2] Laurie Kitner, the front-desk clerk who witnessed part of the incident, testified that Gallagher was wearing baggy pants with the brim of his boxers partially exposed. If true, it is unclear whether this resulted from Agent Calanduano's pat-down or Gallagher's fashion sense; in all events, partially exposed boxers hardly rise to the level of coercive police tactics.

[3] Agent Naylor testified that he actually arrived during the arrest, but waited, however briefly, for the arrest to conclude before entering the parking lot.

2006) (direct examination), or "you don't have to give consent if you don't want." (Hr'g Tr. 40:1-2, Sept. 18, 2006) (cross-examination). Agent Naylor checked Gallagher's pockets, but, not finding a key, retrieved a copy of a key to Gallagher's room from a motel employee.[4] Key in hand, Agent Naylor entered the motel room after informing at least Agents MacIsaac and Kelleher (confirmed by both) that Gallagher had consented to the search. Because of the clutter, however, Agent Naylor went back and asked Gallagher for more specific directions. Gallagher complied. Following Gallagher's instructions, Agent Naylor discovered twenty-three grams of crack, thirteen grams of powder cocaine, two grams of marijuana, a digital scale replete with cocaine residue, and a box of plastic sandwich bags.

Gallagher disputes two assertions of Agent Naylor's account of their car-bound conversation. First, Gallagher denies that Agent

---

[4] Exactly how Agent Naylor obtained a key to room 117 is a mystery in this case, although perhaps not an important one. Agent Naylor claims that he approached the motel manager, identified himself as a police officer who was arresting "Mr. Gallagher," and was handed a key to room 117. The manager of the Pineapple Inn, Makur Patel, testified that he was present during the arrest, but did not remember giving anyone a key to the room. Kitner testified similarly. The only other person authorized to dispense room keys, Patel explained, was his wife, who remained in the family apartment throughout the incident and did not testify. When asked, Patel testified that he would have given a room key to Agent Naylor if requested (Patel simply claims not to remember); however, Patel testified that he would not have given a room key to Gallagher because room 117 was under a different name – Tanya Plummer, apparently one of Gallagher's girlfriends. Under these circumstances, it is unclear how the invocation of "Mr. Gallagher" would have resulted in the production of a key to room 117.

Naylor, or anyone else for that matter, read him his Miranda rights at the scene. Second, although Gallagher concedes that he admitted to and disclosed the location of certain contraband in his motel room, he testified that Agent Naylor did not ask for, or otherwise receive, consent to the search. This proffer with respect to the contraband, Gallagher continues, was entirely a product of coercion; according to Gallagher, Agent Naylor and one other unidentified agent threatened to charge "the women," (Hr'g Tr. 26:11-18, Sept. 21, 2006), presumably Gallagher's girlfriends, unless he did so.[5] Naylor, of course, denies using Gallagher's girlfriends as leverage in any way. More on the issue of consent later, but, for our purposes here, the Court finds Agent Naylor's testimony to be credible.

The remaining facts are not in dispute. After the search, Agent Naylor brought Gallagher to the police station. There, Gallagher signed a written waiver of rights and answered a series of questions that Agent Naylor tape-recorded and later transcribed. In his responses, Gallagher admitted to the contraband seized that day at the Pineapple Inn and to his participation in a number of controlled buys caught on videotape and shown to Gallagher during the interview.

---

[5] There is no evidence or insinuation that Nina Stanley, one of Gallagher's girlfriends who was present during the arrest, was herself threatened.

## II. Discussion

Recognizing that he has not been charged with possession of the contraband seized at the Pineapple Inn, Gallagher advances a novel attack on the admissibility of the oral and written statements at issue. As a preliminary matter, without contesting the legality of his arrest, Gallagher challenges the voluntariness of his consent to search the motel room. According to Gallagher, this deficiency rendered the warrantless search unconstitutional, but more importantly here, tainted Gallagher's subsequent oral and written statements, notwithstanding his concomitant authorized arrest. Separately, Gallagher contends that he did not voluntarily waive his Miranda rights at the scene. Even if he had (as he did at the police station), Gallagher continues, voluntariness under the Fifth Amendment does not in and of itself attenuate a Fourth Amendment violation.

Discussion of Gallagher's ultimate conclusion, however interesting, would be purely an academic exercise — a Sirens' call this Court will not answer — because this Court finds, based on its findings of fact above, that Gallagher's consent was voluntary.[6]

---

[6] The interested reader might explore Wong Sun v. United States, 371 U.S. 471 (1963) (drawing no distinction, under the Fourth Amendment, between verbal and physical evidence derived "so immediately" from an unlawful search or unauthorized arrest); Brown v. Illinois, 422 U.S. 590 (1975) (rejecting the argument that a voluntarily waiver of Miranda rights excuses an unlawful search; rather, the product of the unlawful search — verbal or physical evidence — must be "sufficiently of an act of free will to purge the primary taint"); United States v. Paradis, 351 F.3d 21 (1st

Consent, freely and voluntarily given, is "one of the 'few specifically established and well-delineated exceptions' to the warrant requirement." United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). "It is the prosecution's burden to establish, by a preponderance of the evidence, that consent was 'freely and voluntarily given;' there must be more than mere acquiescence in the face of an unfounded claim of present lawful authority." United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000). "Voluntariness turns on a number of factors, including the person's 'age, education, experience, intelligence, and knowledge of the right to withhold consent,'" United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999) (quoting United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993)), and "whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances." Id. "While 'sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody, custody alone has never been enough in itself to demonstrate . . . coerced . . . consent to search.'" United State v. Trueber, 238 F.3d 79, 95 (1st

Cir. 2003) (denying the defendant's motion to suppress because, assuming without deciding that the unlawful search played a role in obtaining the statement, the interview would have taken place anyway).

Cir. 2001) (quoting United States v. Callazo-Aponte, 216 F.3d 163, 187 (1st Cir. 2000)). The inquiry is a factual one, "determinable from the totality of the circumstances." United States v. Romain, 393 F.3d 63, 69 (1st Cir. 2004).

Reports of police coercion in this case are much exaggerated. The Court has already rejected Gallagher's accusations that Agent Colanduono partially undressed him during the pat-down and that Agent Naylor threatened to charge his girlfriends. The circumstances that remain are not alarming. Gallagher is correct in that he was arrested at gunpoint (the testimony supports two drawn weapons and possibly a taser), but Gallagher had been arrested several times before, making him presumptively "less likely than most to be intimidated by the agents' show of force," United States v. Cepulonis, 530 F.2d 238, 244 (1st Cir. 1976), and all guns had been holstered before he was asked to consent. United States v. Barnett, 989 F.2d 546, 556 (1st Cir. 1993). Certainly, Gallagher was handcuffed and placed inside a police vehicle before he gave consent, but custody alone does not transform consent "freely and voluntarily given" into "mere acquiescence." See Trueber, 238 F.3d at 95. Indeed, Agent Naylor advised Gallagher of his Miranda rights at the threshold, thus "put[ting] him on notice that he [could] refuse to cooperate," Barnett, 989 F.2d at 556 (quoting Cepulonis, 530 F.2d at 244), and informed Gallagher again that consent was optional when Gallagher said he did not have the

key to his room. Cf. United States v. Blais, 98 F.3d 647, 650 (1st Cir. 1996) (noting that even the failure to inform an individual of his right to withhold consent does not necessarily preclude a finding of valid consent). And the fact that Gallagher gave consent orally, as opposed to signing a written consent form, does not diminish its validity, although evidence of written consent is, for obvious reasons, preferred. See Barnett, 989 F.2d at 555.

For many of the same reasons, the Court finds that Gallagher voluntarily waived his Fifth Amendment rights. Gallagher's extensive experience with the criminal justice system and previous exposure to Miranda warnings make it "extremely unlikely that he failed to understand his rights at the time he made these incriminating statements." United States v. Rojas-Tapia, 446 F.3d 1, 8 (1st Cir. 2006). That police used an implied "threat" or "promise" to induce his waiver is not supported; even if some support existed, Gallagher's familiarity with law enforcement would decrease the extent to which such influence would have overborne his will to decline Agent Naylor's invitation. See United States v. Jackson, 918 F.2d 236, 241-42 (1st Cir. 1990). Gallagher's assertion of intoxication (alcohol, cocaine, et cetera) on the day of the arrest is similarly unsupported, and was seriously impugned on cross-examination. In any event, "a defendant's mental state by itself and apart from its relation to official coercion never disposes of the inquiry into constitutional voluntariness," United

States v. Palmer, 203 F.3d 55, 61-62 (1st Cir. 2000); this is especially so where, as here, a confessor appears clear-headed and responsive to a police officer with experience in identifying symptoms of substance abuse. See, e.g., id.; United States v. Smith, 218 F.3d 777, 781-82 (7th Cir. 2000); United States v. Turner, 157 F.3d 552, 555-56 (8th Cir. 1998).

One more point is worth mentioning. The Court notes that many of the factual predicates in this case hinge on Agent Naylor's credibility. The lack of written consent at the scene or first-hand corroboration of Agent Naylor's testimony, while in no way dispositive, made this finding somewhat of a close call. The Court ultimately rejected Gallagher's version of events, but did so only after deliberate consideration because his story was not implausible. The government's prosecution of this case frustrated rather than encouraged this result. (The failure to call a presumably favorable witness and the not-so-subtle insinuation, during closing argument, that Agent Naylor's status as a police officer should influence his credibility assessment come to mind.) That being said, in the end analysis, the Court concluded that Agent Naylor's testimony was simply more believable than Gallagher's.

III. Conclusion

For these reasons, the Motion to Suppress is DENIED.

IT IS SO ORDERED.

William E. Smith
United States District Judge

Date: 11/15/06